[Cite as *In re J.J.*, 2024-Ohio-1049.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE J.J., ET AL. | : | |
| | : | No. 113377 |
| Minor Children | : | |
| | : | |
| [Appeal by Jo.S., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 21, 2024

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22904312 and AD22904313

*Appearances:*

Sylvester Summers, Jr., Co., LPA, and Sylvester Summers, Jr., *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary J. LaFleur, Assistant Prosecuting Attorney, *for appellee.*

FRANK DANIEL CELEBREZZE, III, J.:

{¶ 1} Jo.S. ("Mother") appeals the juvenile court's judgment granting the Cuyahoga County Division of Children and Family Services' ("CCDCFS" or "the agency") motion to modify temporary custody to permanent custody as to Mother's two children, J.J. (d.o.b. 2/19/2010) and J.S. (d.o.b. 8/24/2021) (collectively, "the children"). After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} On April 28, 2022, CCDCFS filed a complaint for dependency and temporary custody of the children.  The complaint alleged that Mother is unable to provide adequate care to the children due to (1) unaddressed substance use issues, (2) unaddressed mental health diagnoses, and (3) her behavioral issues as evidenced by several criminal convictions for trafficking, carrying concealed weapons, disorderly conduct, disorderly conduct while intoxicated, and operating a vehicle while intoxicated.  The complaint also alleged that Mother had previously lost custody of another child and that prior to J.S.'s birth, J.J. was placed in the temporary custody of the Geauga County Department of Children and Family Services.  Neither of the children's alleged fathers had established paternity nor supported, visited, or communicated with the children since birth.[1]  The complaint also alleged that the agency had filed two prior complaints relating to Mother and the children, but both were dismissed without prejudice because they were not resolved within the statutory time frame.

{¶ 3} A predispositional temporary custody hearing was held on May 13, 2022.  Mother contested the allegations in the complaint and the juvenile court granted the agency's motion for predispositional temporary custody, placing the children with two different relatives, and ordered the agency to file a case plan within 30 days.

---

[1] Since Mother brings the instant appeal and has not advanced any arguments relating to the fathers, we do not address either of the fathers in this opinion.

{¶ 4} During a status hearing on June 30, 2022, the agency filed a case plan with the ultimate goal of reunifying Mother with the children. The plan contemplated services for substance abuse and mental health treatment, which the juvenile court approved. During this hearing, Mother also stipulated to the complaint with minor amendments changing the wording of the complaint. The results of this hearing were journalized on July 18, 2022, and the children were adjudicated dependent and committed to the temporary custody of the agency.

{¶ 5} On March 27, 2023, CCDCFS filed a motion to modify temporary custody to permanent custody. During a dispositional review hearing on April 20, 2023, the juvenile court determined that Mother had not made significant progress on the case plan and continued predispositional temporary custody of the children to allow Mother more time to attempt to complete the case plan.

{¶ 6} The hearing on the motion to modify temporary custody to permanent custody was continued several times. On May 25, 2023, the parties appeared but the juvenile court found that Mother had not been properly served and continued the matter to July 10, 2023. On July 10, 2023, Mother failed to appear and the matter was continued to August 22, 2023. On August 22, 2023, Mother appeared but denied the allegations of the complaint, waived service defects, and requested counsel for trial, so the matter was continued to October 13, 2023.

{¶ 7} The trial on the motion to modify temporary custody to permanent custody commenced on October 13, 2023. Mother's counsel requested a continuance, arguing that despite setting numerous appointments, she was never

able to meet with Mother prior to the trial. CCDCFS objected, citing the (1) lack of a written request for a continuance, (2) numerous prior continuances, (3) lack of a date certain when Mother would be cooperative with her counsel, (4) children's continued residence with relatives since 2021, and (5) number of parties to the case who all appeared for trial that day. The juvenile court denied the continuance.

{¶ 8} Aimee Collins ("Collins"), a CCDCFS case worker, testified that she had been assigned to Mother's case in approximately November 2021, during the pendency of one of the previous complaints that had been dismissed. Collins referred Mother to several providers to address her substance abuse and mental health issues, and Collins detailed Mother's progress.

{¶ 9} In November 2021, Mother was referred to Rosary Hall at St. Vincent Charity Medical Center ("Rosary Hall") where she completed a substance abuse assessment and received a diagnosis of severe alcohol use disorder. It was recommended that she engage in intense outpatient 2.1, which she began engaging in, but was referred to a higher level of care (intense inpatient 3.5) about six weeks into treatment. Since Rosary Hall did not offer this service, Mother was referred to New Visions Unlimited, Inc. ("New Visions") for another substance abuse assessment, where she received a diagnosis of severe alcohol use disorder, and remission of mild cannabis use. She was recommended to participate in intense outpatient 2.1 services, but Mother never engaged New Visions for these services. Around this time, Mother also tested positive on an agency drug screen for alcohol and cocaine.

{¶ 10} Mother, of her own volition, began treatment at Lake Area Recovery Center's New Beginnings program ("New Beginnings") in December 2021, where, following her initial assessment, she was diagnosed with severe alcohol abuse disorder and it was recommended that she participate in intense inpatient 3.1 services. Mother completed these services, staying at New Beginnings for 30 days before she was discharged with instructions to continue services in an intense outpatient program and an aftercare program. Mother was referred back to Rosary Hall to complete these services, which Collins testified that Mother engaged in, but Mother's substance use screening at the end of January remained positive for alcohol. In February 2022, Rosary Hall sent Mother a letter requiring her to commit to the program and threatened her with discharge if she did not comply. She was ultimately discharged from Rosary Hall in March 2022.

{¶ 11} Collins testified that at this time, Mother refused to engage with CCDCFS and refused to engage in any further services. Mother revoked the agency's access to her medical information. To Collins's knowledge, Mother had not engaged with any of the recommended programs since, despite the agency sending several case plan letters. Additionally, despite the agency requesting drug screens nearly four times a month, Mother had not completed any since March 30, 2022, where the result was negative. Collins testified that CCDCFS considers no-shows to drug screens as positive tests, could not testify as to whether Mother was sober at the time of trial, and that Mother had not completed her case plan services for substance abuse as of the date of trial. On cross-examination, Collins admitted that she had

never thought that Mother was under the influence when she was around her, but did cite an incident during visitation where Mother was worked up and had to be removed by security.

{¶ 12} Regarding the mental health services, Collins testified that Mother had engaged in services with Murtis Taylor in 2019, but was no longer engaged in these services at the time the complaint was filed. Despite the agency's efforts to reengage Mother with Murtis Taylor Human Services System ("Murtis Taylor"), Mother refused. Collins testified that Mother informed the agency that she was engaged in mental health services, but never told the agency where she was receiving services or authorized the agency to retrieve records associated with such services. At the time of trial, the agency did not have any record of Mother engaging in any mental health services.

{¶ 13} Regarding Mother's engagement and visitation with the children, Collins testified that Mother was scheduled for biweekly visits at the agency with the two children, and the agency provided transportation. The agency originally attempted to set up visitation weekly at Murtis Taylor, but Mother never cooperated with the agency's attempts to orchestrate this. Collins testified that while Mother appeared for every visit, she would only stay for 30 to 60 minutes. As the visits progressed, Mother would stay longer, but did not show up to visits on a consistent basis, waning to about one visit per month. At the time of trial, Mother had last visited the children in August 2023, though Collins admitted on cross-examination that this could be because visitation no longer worked with Mother's recent work

schedule. Nonetheless, she testified that Mother never attempted to alter her visitation schedule based on a new work schedule.

{¶ 14} Collins testified that J.J. and Mother are well-bonded though Mother tends to be critical of J.J. She also testified that since J.S. has not known Mother for as long, there was not much of a relationship and J.S. would continuously cry during the initial visits. While J.S. has warmed up to Mother, he prefers being with J.J. during the visitations and the children are incredibly well-bonded.

{¶ 15} Collins testified that J.J., who was 13-years-old at the time of the trial, has had many disruptive placements with relatives throughout this process due to her behavior and because the relatives thought the placement would only be temporary. At the time of trial, however, J.J. had settled with fictive kin in a placement that is next door to J.S. The placement has been approved by the agency and is very cooperative. J.J. and the caregiver have both expressed that they are content with this placement and that the caregiver and J.J. have a great relationship with each other and the caregiver's young child.

{¶ 16} At the time of trial, J.S. was placed with his maternal great-aunt and uncle, right next door to J.J.'s placement. The relatives have been cooperative with the agency. J.S. also completed case plan services in the "Help Me Grow" program, but did not require extensive services because his development was consistent with other children his age.

{¶ 17} The agency rested following Collins's testimony, and Mother did not call any witnesses. During closing arguments, J.J.'s counsel conveyed that J.J. loves

Mother and would like to return to Mother if possible, but realizes that if she cannot, she is "okay staying where she is." (Tr. 73.) The children's guardian ad litem rested on his report, which recommended permanent custody of both children to the agency.

{¶ 18} The court announced that it would be awarding permanent custody of the children to the agency. On November 1, 2023, the juvenile court journalized the decision terminating Mother's parental rights and granted permanent custody of the children to CCDCFS.

{¶ 19} Mother timely appealed, assigning a single error for our review:

> The trial court erred in awarding permanent custody to [CCDCFS] as [CCDCFS] failed to show by clear and convincing evidence that adequate grounds existed for a grant of permanent custody and therefore such decision was contrary to the manifest weight of the evidence.

## II. Law and Analysis

{¶ 20} CCDCFS sought custody in this matter pursuant to R.C. 2151.413. Under R.C. 2151.413, CCDCFS first obtained temporary custody, then filed a motion for permanent custody.

{¶ 21} R.C. 2151.414(B)(1) provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A juvenile court may grant a child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply.

{¶ 22} When determining the first prong, that permanent custody is in the best interest of the child, R.C. 2151.414(D)(1) dictates that the court shall consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 23} Regarding prong two, the juvenile court found that subsection (B)(1)(a) was clearly and convincingly supported by the record. In its entirety, subsection (B)(1)(a) provides:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(B)(1)(a).

{¶ 24} The Ohio Supreme Court unanimously clarified that the proper appellate standard of review in permanent custody cases heard pursuant to R.C. 2151.414 are either "sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence, as appropriate depending on the nature of the arguments presented by the parties." *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 18. Mother's assignment of error and arguments challenge the manifest weight of the evidence, so that is the standard that we use in reviewing this matter. A juvenile court's decision on a motion to modify temporary custody to permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence." *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16. "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 25} In the instant appeal, Mother challenges both prongs of R.C. 2151.414(B)(1).

{¶ 26} Regarding the first prong, the juvenile court's judgment entry states that it considered all of the relevant R.C. 2151.414(D) factors, and made specific findings that

> J.J. is placed with fictive kin, the mother of one of her cousins. She has stayed with this person on and off since February of 2023. She has her own room and is getting good grades and is happy there. Her little brother, J.S., lives right next door. J.S. lives with a maternal great aunt and uncle. He has lived with them since two months after his birth; he is currently two years old. J.S. and J.J. are very bonded with each other. The Guardian Ad Litem for the children recommends that permanent custody is in their best interest.

{¶ 27} On appeal, Mother concedes that the juvenile court considered all the relevant factors, but that the determination that permanent custody was in the best interest of the children was against the manifest weight of the evidence. Specifically, Mother argues that the juvenile court "did not specifically tie its analysis to the enumerated factors, instead providing [a] more general, yet still comprehensive, analysis." Mother does not dispute any of the specific factors but argues that she "tried to complete her requirements under the case plan, and has proven that she can provide a more stable environment for her children if [] given more time" and that the record demonstrates that Mother is well-bonded with the children.

{¶ 28} The best-interest determination focuses on the best interest of the child, not the parents. *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 59. The juvenile court is required to consider each R.C. 2151.414(D)(1) factor and no factor is afforded greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga

No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. We review each of the (D)(1) factors in turn.

{¶ 29} Subsection (a) considers the interaction and interrelationship of the children with their parents, siblings, relatives, and foster caregivers. Evidence was presented that J.J. and J.S. are bonded to each other. In their current placements, they live next door to each other and see each other frequently. J.J. is doing well with her current placement; she is exhibiting improved behavior, improved grades, and maintains a fulfilling relationship with her caregiver and the caregiver's child. J.S., who has been in his placement since he was two months old, is developmentally on track and the agency did not have any concerns about his caregivers or home. Mother exhibited inconsistent visitation throughout the pendency of the case, and though Collins admitted on cross-examination that Mother's recent employment could have interfered with her visitation, there was no evidence suggesting that Mother made efforts to reschedule or make different arrangements for visitation by communicating this hardship to the agency.

{¶ 30} Subsection (b) pertains to the wishes of the children, as expressed directly by the children or through the guardian ad litem. J.J. expressed that she loves her Mother, but specifically noted that if reunification was not possible, she was satisfied with her current placement. J.S. is too young to express his wishes, but the guardian ad litem made a permanent custody recommendation.

{¶ 31} Subsection (c) considers the custodial history of the child, including whether the child had been in temporary custody for at least twelve of a consecutive

twenty-two-month period. This factor is not contested, but the children had been in agency custody since July 2022, and remained in the agency's temporary custody until the trial in October 2023.

{¶ 32} Subsection (d) considers the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. The juvenile court found that the child cannot and should not be placed with Mother, as will be discussed in more detail when discussing the second prong of R.C. 2151.414(B)(1).

{¶ 33} Subsection (e) requires consideration that any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. The state concedes that this subsection is inapplicable in the instant matter.

{¶ 34} Based on the foregoing, there was competent, credible evidence from which a trier of fact could have determined that permanent custody was in the best interest of the children.

{¶ 35} Regarding the second prong, the juvenile court found that R.C. 2151.414(B)(1)(a) applied by clear and convincing evidence because "[t]he child cannot be placed with either parent within a reasonable time or should not be placed with the parents." The juvenile court also stated that it would further address this pursuant to the statutory factors enumerated in R.C. 2151.414(E), which addresses factors to consider in determining whether the children cannot or should not be placed with the parent. Under R.C. 2151.414(E), if the court finds by clear and convincing evidence that "*one* or more of the [(E) factors] exist as to each of the

child's parents, the court *shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." (Emphasis added.)

{¶ 36} The juvenile court found that (E) factors (1), (2), (4), (10), (12), and (14) were established by clear and convincing evidence. On appeal, Mother appears to contest the juvenile court's finding pursuant to R.C. 2151.414(E)(1), which provides:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 37} The juvenile court explained that "[Mother] has not completed case plan services nor addressed her substance abuse or mental health despite numerous referrals by CCDCFS. [Mother] has not engaged with the agency or case plan services since March of 2022. Urine screens were requested four times a month. [Mother] has not provided any urine screens in 2023." Mother argues that the juvenile court could have granted her another six months to complete her case plan, citing R.C. 2151.415(D)(1), which provides that the juvenile court may extend temporary custody for a period of up to six months, but only after the *agency*

requests that the court do so by motion. There was no such motion in the instant matter.

{¶ 38} Mother also argues that the evidence does not clearly and convincingly establish that Mother failed to remedy the conditions causing the removal of the children. She argues that she engaged in the case plan services at the outset, and would have benefitted from additional time to work on her case plan, arguing that she "simply needed more time to convince CCDCFS and the court to show that [she] was capable of retaining [her] full parental rights."

{¶ 39} We disagree. First, we address Mother's contention that she merely needed more time to fully complete and engage with the case plan services. R.C. 2151.353(G) provides that "the statutory term for a temporary custody order is one year. While the agency is permitted to seek up to two six-month extensions of temporary custody," that decision is left to the sole discretion of the agency. *In re J.A.*, 8th Dist. Cuyahoga No. 111029, 2022-Ohio-1324, ¶ 36, citing R.C. 2151.415(A)(6) and (D)(1)-(4); *In re A.C.*, 2d Dist. Montgomery No. 26211, 2014-Ohio-4402, ¶ 18. A parent "is afforded a reasonable, not indefinite, period of time to remedy the conditions causing the children's removal." *In re A.L.A. & A.S.A.*, 11th Dist. Lake Nos. 2011-L-020 and 2011-L-021, 2011-Ohio-3124, ¶ 108.

{¶ 40} Temporary custody was granted July 18, 2022, but the agency had lost all contact with Mother in March 2022, while previous complaints were pending against Mother. Despite the agency's attempts to contact Mother and Mother's presence at nearly all hearings relevant to this case, Mother never engaged with the

agency or attempted to engage in the services contemplated by her case plan. Further, Mother never submitted to a drug test during the pendency of this case even though she stipulated to the need to address her substance abuse issues in the amended complaint. Based on Mother's lack of cooperation or desire to engage in her case plan, we cannot say that the record supports that Mother merely needed more time to complete her case plan. Furthermore, because this complaint was refiled after a prior complaint was dismissed, Mother had more time than is usual in parental rights cases to remedy the conditions that led to the removal of the children.

{¶ 41} Second, the record contains competent and credible evidence from which a trier of fact could conclude that Mother did not substantially remedy the conditions causing removal of the children. Mother argues that even though her case plan was not completed, the agency did not demonstrate any evidence suggesting that she did not substantially remedy the conditions causing removal of the children. We disagree.

{¶ 42} Despite referrals to numerous substance abuse programs, Mother did not successfully complete any of them, nor did she remain consistent with the treatment. There is no evidence in the record that Mother engaged in *any* mental health services, despite these services being required by her case plan. Mother also stipulated to the amended complaint that provided that Mother needed to seek treatment for her mental health concerns. By March 2022, before the instant complaint was even filed, Mother had decided to cut all ties with the agency,

revoking her medical release of information forms and refusing to speak to the agency. At the time of trial, Mother had not completed a drug screen since March 2022, despite being requested to provide one, four times a month since that date.

{¶ 43} Because of Mother's noncompliance, there was very little evidence that could have been presented indicating that Mother remedied the conditions leading to the children's removal. We cannot say that the record does not contain competent, credible evidence demonstrating that Mother failed to remedy the conditions leading to the removal of the children.

{¶ 44} Based on the foregoing, we overrule Mother's sole assignment of error.

### III. Conclusion

{¶ 45} The record clearly and convincingly supports that (1) permanent custody was in the best interest of the children and (2) the children cannot and should not have been placed with Mother.

{¶ 46} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, JUDGE

LISA B. FORBES, P.J., and
EMANUELLA D. GROVES, J., CONCUR