[Cite as *In re M.T.*, 2024-Ohio-3111.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE M.T. | : | |
| | : | No. 113446 |
| A Minor Child | : | |
| | : | |
| [Appeal by K.P., Mother] | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 15, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22-908132

---

### *Appearances:*

Barbara Martincic, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young and Mohammed A. Misbah, Assistant Prosecuting Attorneys, *for appellee*.

EILEEN A. GALLAGHER, P.J.:

**{¶ 1}** Appellant-mother, K.P. ("Mother"), appeals from the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court") that granted permanent custody of her minor son, M.T., to appellee, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we affirm.

**Factual Background and Procedural History**

{¶ 2} On August 12, 2022, CCDCFS filed a complaint for dependency and temporary custody of M.T. (d.o.b. August 10, 2022), along with a motion for predispositional temporary custody. The complaint alleged that Mother had a substance abuse problem (i.e., marijuana) that interfered with her ability to be a sober caregiver for her child, that Mother had regularly smoked marijuana while pregnant with M.T. and that Mother lacked "appropriate parenting judgment." The complaint further alleged that M.T.'s half-sister, K.T. (d.o.b. February 9, 2021), had previously been adjudicated neglected due, in part, to Mother's substance abuse issues and inappropriate parenting judgment and was in the temporary custody of CCDCFS. With respect to A.T., the alleged father of M.T., the complaint alleged that he had failed to establish paternity and had failed to support, visit or communicate with M.T. since birth.

{¶ 3} Following a hearing on the motion, the juvenile court granted the agency's motion for predispositional temporary custody and committed M.T. to the predispositional temporary custody of CCDCFS.

{¶ 4} On August 29, 2022, the agency filed a case plan that required Mother to complete domestic violence and parenting classes, to consistently attend counseling sessions, to take prescribed medication for post-traumatic stress disorder ("PTSD") and depression, to complete a substance abuse assessment and comply with any treatment recommendations and to submit to random drug

screens.  The permanency goal was reunification.  The juvenile court approved the case plan.

**{¶ 5}**  On October 28, 2022, a magistrate conducted adjudicatory and dispositional hearings.  Mother and A.T. admitted to the allegations contained in an amended complaint[1] and M.T. was adjudicated dependent.  Mother and A.T. stipulated to temporary custody and M.T. was placed in the temporary custody of CCDCFS.

**{¶ 6}**  On April 6, 2023, the agency filed a motion to modify temporary custody to permanent custody to CCDCFS ("motion for permanent custody") pursuant to R.C. 2151.414(B)(1)(a) and the best interest of the child.  In support of the motion, the agency submitted an affidavit from CCDCFS social worker Nicole House ("House"), who averred, as related to Mother, that (1) Mother had not successfully completed a drug treatment program, continued to use drugs and had overdosed on cocaine requiring hospitalization in February 2023, (2) Mother "did

---

[1] The amended complaint alleged, in relevant part:

1.  Mother must maintain a sober lifestyle.
2.  Mother needs to use appropriate judgment when parenting.
3.  Child's sibling was adjudicated Neglected due, in part, to mother's substance abuse issues and inappropriate parenting judgment and is currently in the Temporary Custody of CCSCFS.  See Case No. AD21903828.
4.  Alleged father, A.T., needs to establish paternity and support the child.

. . .

Reasonable efforts were made by Cuyahoga County Division of Children and Family Services to prevent removal of the child from the home and removal is in the best interest of the child.

not benefit" from domestic violence counseling and continued to be involved a domestically violent relationship with A.T., causing her to be evicted from her apartment in January 2023, (3) Mother did not have stable housing, (4) Mother was not compliant with her mental health medication and (5) Mother had another child who had been previously adjudicated neglected and placed in temporary custody "due in part to [M]other's substance abuse, domestic violence, parenting, and untreated mental health."

**Hearing on Motion for Permanent Custody**

{¶ 7}   On November 6, 2023, the trial court held a hearing on the motion for permanent custody in this case and a motion for permanent custody that had been filed in the case of M.T.'s half-sister, E.T.[2]  House, who was assigned to both cases, was the sole witness to testify at the hearing.

{¶ 8}   At the time of the hearing, M.T. was approximately 15 months old and E.T. was approximately two years and nine months old.  House testified that a case was initially opened with respect to E.T. because Mother was "blowing a lot of smoke down her daughter's mouth."[3]  E.T. was placed in the predispositional temporary custody of the agency on May 10, 2021.  M.T. was placed in the predispositional

---

[2] Mother has not appealed the juvenile court's ruling granting permanent custody of E.T. to the agency.

[3] Although House did not explain this at the permanent custody hearing, House had previously testified, at the hearing on the agency's motion for predispositional temporary custody of M.T., that, after E.T. was born and while Mother was pregnant with M.T., Mother not only used marijuana but "blew marijuana smoke in [E.T.'s] mouth to relax her."

temporary custody of the agency on August 12, 2022, when he was released from the hospital, two days after his birth. House stated that the case plan objectives for Mother related to domestic violence, basic needs (in particular, housing), substance abuse, parenting and mental health.

{¶ 9} House testified that domestic violence services were a part of Mother's case plan because Mother had a history of domestic violence with A.T. as well as with E.T.'s father. House stated that E.T.'s father was sent to prison following an incident in which he broke Mother's ribs while she was staying at a Community Assessment & Treatment Services ("CATS") residential facility for substance abuse treatment and that he is expected to be released from prison in November 2025.

{¶ 10} With respect to A.T., House testified that domestic violence between Mother and A.T. is an "ongoing concern," "on and off." She indicated that a domestic violence altercation between Mother and A.T. in January 2023 led to Mother being evicted from her apartment. One month later, A.T. and Mother were involved in another altercation in which A.T. set fire to his own apartment while burning Mother's belongings. As a result of the February 2023 incident, A.T. was evicted, arrested and sent to jail. House stated that although A.T. had claimed that Mother had "aggressed against him" and she had once observed A.T. "all scratched up," Mother had not been charged with domestic violence or identified as an aggressor in any police report. House noted, however, that a person does not need to be an aggressor for domestic violence to be a concern. She explained:

[I]f the person who is not the aggressor is promoting a behavior, they're calling the person on the phone, they're concerned with their whereabouts, they're inviting them over to their house, they're still keeping some form of communication and concern with that person, it makes them — as the Agency, we see that as a way of them not as a parent.

We look at it as them not self-protecting not only themselves, but their babies, their children.

{¶ 11} House indicated that this was the concern for the agency as it related to Mother because

she's concerned about all of them . . . and what they do and things of that nature, and that's a safety issue because . . . you're showing this much concern, so much energy towards these men. They continue to aggress towards you. What about once we get these kids alone with you? What are you gonna do?

{¶ 12} House stated that the agency had referred Mother to several different service providers for domestic violence services, including the Jordan Community Resource Center/Jordan House ("Jordan House"), the Domestic Violence Shelter Place for Women and the Hitchcock Center for Women, Inc. ("Hitchcock Center") but that Mother completed only one program — a program at Jordan House in July 2023. House claimed that Mother did not benefit from the program at Jordan House because (1) while she was engaged in the program, she informed A.T. of her location, placing herself and others staying at Jordan House in danger and (2) two weeks after she received her certificate of completion for the program — in July or August 2023 — she "got beat up" by A.T. while she was walking down the street on her way to inquire about a job.

{¶ 13} House stated that, after this incident, Jordan House moved Mother to a different location because they were concerned for her safety. House testified that when she and her supervisor explained to Mother at a staffing that they believed she "did not benefit" from services because of her continued communications with A.T., leading to another assault by him, Mother "refused to do the domestic violence service back over again." Rather than of reengaging in domestic violence services at another provider suggested by House, Mother "took it upon herself and got her own place." House testified that Mother had reengaged with domestic violence services late in October 2023 at the Rape Crisis Center but had not yet fully addressed the agency's concerns with regard to domestic violence.

{¶ 14} With respect to housing and Mother's ability to meet the children's basic needs, House testified that Mother at one time had stable housing at a YMCA apartment complex but that, as a result of an altercation with A.T., she was "kicked out" of that apartment in January 2023. From approximately February 2023 until August or September 2023, Mother lived at Jordan House. After she was assaulted by A.T. and left Jordan House, Mother lived briefly at a domestic violence shelter and then with an aunt before securing her current housing.

{¶ 15} At the time of the hearing, Mother had been living at a treatment facility, Mommy and Me, for approximately two months. House indicated that the Mommy and Me program provides temporary housing, usually for up to six months, but "sometimes they can go past the six months." House testified that she had visited Mother's rooms at Mommy and Me and that the room in which the children

would be sleeping, if they were returned to Mother's care, was "a very small room." House stated that although the agency could "try to help with beds and stuff like that," it was "not a good space." House testified that, in her view, Mother's housing at Mommy and Me was not "appropriate" because there were many restrictions placed on residents and Mother could be "kicked out" if she violated them. House indicated that Mother had been "kicked out" of several different treatment facilities in the past and that in September 2023, Mother had been "kicked out" of a domestic violence shelter. House acknowledged, however, that Mother had "followed their rules" for the two months she had resided at Mommy and Me.

{¶ 16} House testified that, as of the date of the hearing, the agency was "not as comfortable as we would like to be" with respect to Mother's ability to provide for her young children's basic needs. She stated that the agency had previously discussed "her unstableness for housing" with Mother and told her that "she needs to step up a little bit more." House noted that Mother had recently obtained a voucher for a one-bedroom house through the EDEN program and that Mother claimed that she could be "upgraded" to a larger home "if things get better" but that Mother could not use the voucher until January or February 2024. House indicated that Mother was employed at a fast food restaurant and in the last three or four months had been providing "little toys, diapers, things like that" for the children. House stated that Mother would need to find a babysitter while she worked if the children were returned to her care and that Mother did not yet "have a plan."

**{¶ 17}** With respect to substance abuse, House testified that Mother had "been though" eight or nine different substance abuse treatment programs.[4] She indicated that Mother completed detox at the Hitchcock Center but "didn't follow the recommendation" to do an intensive outpatient program, so they "kicked her out." Mother then entered CATS but was "kicked out" of that treatment program. House could not recall the specific reason for Mother's discharge from that program. She stated that it was either because Mother left the facility at an inappropriate time, because of the domestic violence incident with E.T.'s father or because she had tested positive for drugs. She stated that Mother then attended treatment programs at Mommy and Me and Nora's Home but was discharged from those programs for leaving with A.T. in violation of program rules and "stuff like that."

**{¶ 18}** House testified that in February 2023, while Mother was transitioning from Nora's Home to Jordan House, Mother obtained cocaine from a drug dealer who sexually trafficked her. Mother overdosed on cocaine, went into cardiac arrest and was hospitalized at the Cleveland Clinic.

**{¶ 19}** Upon Mother's release from the Cleveland Clinic, she entered an inpatient drug treatment program at Jordan House and "began to make some improvement," dropping clean urine screens and "faithfully attending their services." House indicated that Mother's "last dirty urine screen" was in February 2023, when she tested positive for cocaine.

---

[4] Although House stated that Mother had been through eight or nine substance abuse treatment programs, she identified only five programs during her testimony at the permanent custody hearing.

{¶ 20} House testified that although Mother had been sober for eight months and the agency generally looks for six months of sobriety when considering reunification. The agency was, nevertheless, concerned that Mother's sobriety was "unstable" because her substance abuse was inextricably intertwined with other issues, including her poor decision-making and her history of domestic violence. House explained:

> We feel that mom's probability of relapse is very high due to the fact of the consistency with different treatment facilities and her poor decision-making skills and choosing partners and things of that nature because everything she does goes back to leading to some type of [domestic violence] or some type of substance abuse, and it seems like she would do good for a second.
>
> She has increments of great success. Then she'd fall right back down to the same level and go back to either using or get back in an unhealthy relationship.
>
> So we're concerned. We feel like she's not stable. We feel like she's going through the mechanics of services, but has not benefited from services.
>
> We're thankful that she is trying, but at the same time there's a lack of enthusiasm at times. She has moments of she's very good and happy and everything's great, and then something comes up.

In short, House stated that the agency was concerned that "if the right person comes in[to] her life again," Mother would "go back" to substance abuse.

{¶ 21} With respect to Mother's mental health issues, House testified that Mother had been diagnosed with depression and anxiety. She indicated that, "at one point mentally [Mother] was doing an excellent job" and that "she's always got some kind of counseling because inside those treatment facilities you go to and those shelters, they make you do counseling," but that, in the last two months, Mother had

stopped taking her mental health medication because, according to Mother, she "didn't get . . . her last prescription" before she left Jordan House and moved into the domestic violence shelter. House testified that several days before the hearing, House took Mother to pick up her medication and Mother resumed taking it. House testified that when Mother does not take her medication she is "a little bit on edge" "about every little thing" and "everything [is] a problem."

{¶ 22} House testified that parenting skills were part of Mother's case plan objectives because "when the case first opened up," the agency felt Mother had "poor parental decision-making skills." She stated that certain of Mother's parental decisions, such as "blowing smoke down [E.T.'s] mouth," were "not appropriate."

{¶ 23} Although Mother had completed parenting classes and was regularly visiting with her children, House testified that Mother was still permitted only two hours of supervised visitation with her children each week because "she had not completed her other case plan services." House rated Mother's parenting skills as "fair" and stated that Mother's behavior when visiting the children was generally "okay" but that the agency was "not confident at all" that Mother would be able to handle "the responsibility . . . mentally, emotionally and physically" of parenting her two young children. She indicated that there are "still some gray areas that need to be addressed," such as Mother's inconsistent views regarding whether she wants to continue to have a relationship with her children's fathers — e.g., statements that indicate that "she's still keeping up [on] what they're doing," notwithstanding her recognition that "they're negative, they're not good for me." House indicated that

during visitation with Mother, the children sometimes acknowledge Mother and sometimes they "don't want to be bothered."

**{¶ 24}** House testified that E.T. had been in her current foster placement since she was three or four months old, that M.T. had been placed in the same foster home as soon as he left the hospital after birth and that, although M.T. was "a little bit delayed" in his development, he was "making progress" and both children were "thriving" in their placement. House indicated that the agency had attempted to find a relative placement for the children but was unsuccessful.

**{¶ 25}** House stated that, in the agency's view, overall, Mother's progress on her case plan was "moderate to poor." Although Mother had completed parenting classes, a domestic violence program and a substance abuse treatment program, that she was "currently compliant" with mental health services and medication and had been sober for eight months, House testified that the agency did not feel that Mother had fully addressed the agency's concerns regarding her parenting, mental health, substance abuse, domestic violence and ability to meet the children's basic needs. She explained: "I'm not saying she hasn't done anything, but the question is, did she benefit from the stuff that she's already done, and she's currently doing things right now as we speak, so I might just say it's kind of poor, on the poor side." She testified that, in the agency's view, it would be in the best interest of M.T. to be placed in the permanent custody of CCDCFS because (1) Mother "has not benefitted from services" and (2) while Mother had "verbalize[d] her readiness" to parent her children, "her actions sometimes [do] not match up with what she

verbalizes." House did not address what further steps Mother could take to meet her case plan objectives and be reunited with her children.

{¶ 26} With respect to A.T., House testified that his case plan objectives included establishing paternity, visitation with M.T., domestic violence services, substance abuse treatment and a mental health assessment. She indicated that A.T. admitted to her that he had mental health problems and used drugs, specifically, pills, ecstasy and cocaine.

{¶ 27} She testified that although A.T. had told her he was M.T.'s father, paternity had not been established for M.T. because A.T. did not follow up with DNA testing to confirm his paternity. She stated that A.T. attended visits with M.T. until January 2023. She indicated that, at times, there were some issues with visitation, because, although Mother and A.T. were supposed to have separate visits due to their history of domestic violence, A.T. wanted to visit M.T. "when he wanted to visit with him" — in particular, when Mother was visiting with M.T. — resulting in "many verbal fights, yelling and screaming," with A.T. coming to visits "mad at mom, mom mad at him." House testified that, until he went to jail, she made referrals for A.T. for domestic violence services and encouraged him to undergo both mental health and substance abuse assessments but that he never followed through.

{¶ 28} In addition to the witness testimony, the agency introduced certified copies of certain of the juvenile court's prior journal entries in this case and E.T.'s case to establish "the timeline from when the children were brought into . . . emergency custody" of the agency and certified copies of treatment records from the

Hitchcock Center, Jordan House, the Cleveland Clinic and New Visions Unlimited, Inc. regarding treatment Mother received. The juvenile court admitted the offered exhibits without objection.

**The Guardian Ad Litem's Recommendation**

{¶ 29} On October 30, 2023, the children's guardian ad litem submitted a written report in which he recommended that permanent custody of M.T. and E.T. be granted to the agency.

{¶ 30} The guardian ad litem stated that the agency had worked with Mother "quite a bit over the past two-plus years" since E.T. was first placed in agency custody. He noted that Mother was "now making good strides in her sobriety" but that there are "still serious issues present in keeping herself safe." He indicated that "[t]he biggest concern for Mother at this point seems to be keeping herself safe from domestic violence, and how she can also keep the minor children safe if they are with her." He "question[ed] at least some of Mother's decision-making skills" because she had given out information regarding where she was residing to A.T. and indicated that "[i]f Mother is not able to keep herself safe and free from domestic violence, it is unlikely that Mother can keep her children safe and free from harm resulting from domestic violence." He also expressed concern that "Mother is still making poor choices and may be spending time with . . . active drug users, so her sobriety and hard work may be at risk." In his view, "Mother is still in too much of a risky situation . . . and her circumstances have not advanced enough in the past two years to remedy the risk."

**{¶ 31}** The guardian ad litem reported that Mother "behaved appropriately in caring for both minor children" during visits with them but that after more than two years, Mother's visits with her children were still only two hours every two weeks at a public library[5] and that, although "she has had ample time to remedy the situation," Mother does not have permanent housing. He stated that the children are "in need of permanency and a stable, loving home," that the children are in "an excellent foster home, with a loving caregiver" who more than meets their needs and that he would like to see the children remain in the current caregiver's home.

**The Juvenile Court's Decision**

**{¶ 32}** On November 21, 2023, the juvenile court issued a written journal entry granting permanent custody of M.T. to the agency. The juvenile court found, by clear and convincing evidence, that M.T. could not be placed with either of his parents within a reasonable time or should not be placed with his parents and that it was in M.T.'s best interest to be placed in the permanent custody of the agency.

**{¶ 33}** Mother appealed, raising the following two assignments of error for review:

> Assignment of Error I: The trial court erred by finding that the child cannot be placed with Mother within a reasonable time or should not be placed with her.

> Assignment of Error II: The trial court erred in finding that permanent custody was in the best interest of the child.

---

[5] House testified that Mother has weekly visitation. The case plan also references weekly visitation.

**Law and Analysis**

**Standard for Granting Permanent Custody to CCDCFS**

**{¶ 34}** We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997) (internal quotation omitted); *see also In re Murray*, 52 Ohio St.3d 155, 157 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979) (internal quotation omitted).

**{¶ 35}** Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14 (cleaned up), it is "an alternative of last resort," *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental

rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 1986 Ohio App. LEXIS 7860, *5 (5th Dist. Aug. 1, 1986)

{¶ 36} R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A juvenile court may grant a public child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the following circumstances exists:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

> (b) The child is abandoned.

> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

In this case, the agency moved for permanent custody of M.T. pursuant to R.C. 2151.414(B)(1)(a).

{¶ 37} "Clear and convincing evidence" is that "'measure or degree of proof'" that "'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Cross* at 477.

**Standard of Review in Permanent Custody Cases**

{¶ 38} In *In re Z.C.*, 2023-Ohio-4703, the Ohio Supreme Court clarified the standard of review in permanent custody cases, indicating that sufficiency of the evidence and/or manifest weight of the evidence — and not abuse of discretion — are the proper appellate standard(s) of review of permanent custody determinations depending on the arguments raised by the appellant. *Id.* at ¶ 11.

{¶ 39} "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'"" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. "'[S]ufficiency

is a test of adequacy.'" *In re Z.C.* at ¶ 13, quoting *Thompkins* at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when the evidence is legally sufficient to support the [factfinder's determination] as a matter of law." (Cleaned up.) *In re Z.C.* at ¶ 13.

**{¶ 40}** Manifest weight of the evidence, on the other hand, "is not a question of mathematics, but depends on its effect in inducing belief." (Cleaned up.) *In re Z.C.* at ¶ 13.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley*] at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 14. Although sufficiency and manifest weight of the evidence are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re L.H.*, 2024-Ohio-2271, ¶ 29 (8th Dist.).

**Determination that M.T. Could Not be Placed with Mother within a Reasonable Time or Should Not be Placed with Mother**

{¶ 41} In her first assignment of error, Mother contends that the juvenile court erred in granting permanent custody of M.T. to the agency because its determination that M.T. could not be placed with Mother within a reasonable time or should not be placed with Mother was not supported by clear and convincing evidence and was against the manifest weight of the evidence.

{¶ 42} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider "all relevant evidence." R.C. 2151.414(E). If the court finds, by clear and convincing evidence, that at least one of the factors specified in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents. *Id.* Here, the juvenile court found that the factors specified in R.C. 2151.414(E)(1), (4) and (13) applied to Mother and A.T.:

> (E)(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(E)(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

(E)(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child has abandoned the child: The alleged father is currently incarcerated.

{¶ 43} The juvenile court explained its findings as follows:

The Court finds based on the testimony and evidence presented that there has not been substantial progress in remedying the conditions that caused the removal of the children, that there is not reasonable cause to believe that the children will be reunified with the parents within the extension of temporary custody.

The mother does not have a stable living situation and has not benefitted from case plan services. She had three different addresses in September of 2023 alone. Both the father and the alleged father of her children are incarcerated for domestic violence against her, and there have been three separate incidents of domestic violence between the mother and the alleged father of M.T., yet she continues to associate with the alleged father of M.T. The overall picture of the mother's situation is one of instability. It would not be safe to reunify the children with the mother at this time. And significantly, the Court had already denied permanent custody once in the case of M.T.'s sibling in the hopes that the mother could eventually be reunified. But almost two and a half years later, that is not what the evidence shows as being in the best interest of the children.

. . .

The alleged father, [A.T.] is incarcerated for domestic violence against the mother. Due to domestic violence committed by the alleged father, the mother was evicted from her apartment in January of 2023. In February of 2023, the alleged father set his apartment building on fire during a domestic dispute with the mother and is now incarcerated.

The alleged father, [A.T.] has not established paternity. He has not complied with case plan services.

**{¶ 44}** Mother challenges the juvenile court's findings under (E)(1) and (E)(4) as they relate to her.[6]  Mother argues that the agency failed to prove by clear and convincing evidence that she has "continuously and repeatedly failed to substantially remedy the conditions that initially caused [M.T.] to be placed outside [his] home"[7] or that she "has demonstrated a lack of commitment toward [M.T.]" or otherwise shown "an unwillingness to provide an adequate permanent home for [M.T.]."  She contends that the record is "replete" with evidence that Mother engaged in substance abuse and mental health services, completed domestic violence and parenting programs, had obtained temporary housing and had a plan for securing permanent housing.  She asserts that the juvenile court's findings that "Mother does not have a stable living situation," has "not benefited from her case plan services" and "had three different addresses in September of 2023 alone" were "erroneous" and not supported by the record.

**{¶ 45}** Mother points out that she clearly benefited from substance abuse services given that she was "going on nine months of verified sobriety" at the time of the permanent custody hearing.  She claims that House's testimony that her interactions with M.T. were "appropriate" shows that she benefited from parenting classes and that there was no dispute that Mother had been engaged in mental

---

[6] Because Father has not appealed the juvenile court's decision, we do not further address the juvenile court's findings with respect to Father.

[7] Mother does not dispute that the agency provided "reasonable case planning" and "diligent efforts" to assist her to remedy the problems that caused M.T. to be removed from her care.  Accordingly, we do not address those issues here.

health services, had been taking her medication "after a brief pause" and was making progress. With respect to domestic violence services, Mother asserts that she had completed domestic violence services and that the agency's claim that she had not benefited from such services was based on the fact that A.T. had assaulted her on the street, improperly "blam[ing] the victim." Mother likewise asserts that she had made progress with housing, noting that, at the time of the permanent custody hearing, she was residing at Mommy and Me, where M.T. could reside with her. Although that housing was temporary, Mother asserts that "this did not mean that it . . . was not stable." She points out that she already had a voucher for a one-bedroom home through EDEN and could become eligible for a larger home, if necessary.

{¶ 46} With respect to the juvenile court's (E)(4) finding, Mother asserts that the record shows that she had been visiting regularly with M.T., that her interactions with her children were appropriate, that Mother had provided toys, diapers and clothes for M.T. and that she was clearly willing to provide a permanent home for M.T., having obtained a housing voucher that would enable her to secure permanent housing in two or three months. Although Mother acknowledged that she "might not have completed all of her case plan objectives to the satisfaction of the Agency," she contends that she "certainly made enough progress" to be deemed to have made "significant progress" on her case plan under R.C. 2151.415(D)(1) and that the juvenile court should have, therefore, granted an extension of temporary custody rather than granting permanent custody of M.T. to the agency.

{¶ 47} In response, CCDCFS argues that the juvenile court's findings under R.C. 2151.414(E)(1) and (4) — and thus its finding under R.C. 2151.414(B)(1)(a) — are "supported by the evidence in the record." With respect to its concerns regarding domestic violence, the agency contends that although Mother had engaged in domestic violence services, "it was evident . . . that she had not demonstrated any benefit from the service" because she continued to associate and communicate with A.T., disclosed her location to A.T. (thereby placing herself and potentially other residents of Jordan House in danger) and did not reengage in domestic violence services until a week prior to the permanent custody hearing.

{¶ 48} With respect to basic needs, the agency contends that any claim by Mother that she had secured appropriate housing and could provide a "legally secure home" for M.T. was "unconvincing" and "disingenuous" given her "lack of successful resolution" of the domestic violence and mental health components of her case plan. With respect to Mother's mental health, the agency does not dispute that Mother had consistently engaged in counseling but asserts that Mother's case plan services are "intertwined," i.e., that if "[Mother] had demonstrated a benefit from domestic violence services, she would not have told [A.T.] her location and therefore she would not have been forced to leave [Jordan House] and she would have been able to continue taking her mental health medication uninterrupted." The agency further notes that Mother did not prioritize "getting back on her medication" after she left Jordan House, resuming her medication only days before the permanent custody hearing.

{¶ 49} With respect to Mother's compliance with the substance abuse elements of her case plan, the agency contends that, because Mother only left Jordan House in September 2023, "which means that seven out of the eight months of her sobriety took place within the structured environment of a sober living treatment facility," "it is reasonable for the Trial Court to consider this insufficient evidence of [Mother's] ability to achieve long-term sobriety." The agency does not specifically address Mother's compliance with parenting services, consistency in visitation or her interactions with M.T. in its appellate brief, other than to state that "the overall case record regarding . . . parenting supports the Trial Court's finding that [Mother] failed to remedy the reasons for the child's removal."

{¶ 50} Following careful consideration of the record, we conclude that the record contains clear and convincing evidence supporting the juvenile court's findings under R.C. 2151.414(B)(1)(a), (E)(1) and (4) and that those findings were not against the manifest weight of the evidence.

{¶ 51} Significant or even substantial compliance with case plan services is not, in and of itself, "dispositive" and "does not preclude a grant of permanent custody to a social services agency." *In re J.B.*, 2013-Ohio-1704, at ¶ 90 (8th Dist.), citing *In re C.C.*, 2010-Ohio-780, ¶ 25 (8th Dist.); *see also In re R.D.*, 2022-Ohio-4519, ¶ 59 (8th Dist.). Simply because a parent completes the services identified in a case plan does not mean he or she has achieved the objectives of the case plan related to those services or has substantially remedied the conditions that caused the child to be removed from the home. *In re J.B.* at ¶ 90. "'The issue is not whether

the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'" *Id.*, quoting *In re McKenzie*, 1995 Ohio App. LEXIS 4618, *11 (9th Dist. Oct. 18, 1995); *In re R.D.*, 2022-Ohio-4519, ¶ 59.

**{¶ 52}** Based on the evidence presented at the permanent custody hearing, after receiving more than two years of services directed to remedying the problems that caused M.T. and his sister to be removed from Mother's care, it is clear that Mother is not at a place where she can independently parent M.T. and consistently meet his basic needs, including providing a safe and secure, permanent home for him, and there is no indication in the record that Mother will be able to do so at any reasonable time in the future. The record reflects that although Mother had finally completed parenting classes, a substance abuse treatment program and a domestic violence program, she continued to make choices that put herself and others in harm's way. Despite recognizing that her children's fathers were "negative" and "not good" for her, the record reflects that Mother continued to communicate with, and disclose her location to, at least one of her abusers, which led to incident in which Mother sustained serious physical harm from A.T. just months before the permanent custody hearing.[8] Mother is to be commended for the steps she has taken and the progress she has made, particularly with regard to her sobriety, but she has not shown that she can keep herself safe from domestic violence, much less

---

[8] The record reflects that A.T. and E.T.'s father were in jail or prison at the time of the permanent custody hearing. According to the guardian ad litem, A.T. was awaiting placement into an inpatient drug treatment program.

that she could protect her very young, vulnerable son from such violence and provide him safe, secure, permanent home.

**{¶ 53}** At the time of the permanent custody hearing, Mother was not in a stable living situation. Mother was living in temporary housing at a treatment facility. Although she had secured a voucher to obtain permanent housing, it would be another two or three months before she could even begin looking for permanent housing. Although M.T. had been in custody for nearly 15 months at the time of the permanent custody hearing, Mother's visitation was still limited to two hours of supervised visitation each week at a public library, and Mother had yet to show that she had the mental, emotional and physical skills necessary to appropriately parent him and keep him safe.

**{¶ 54}** Even where there is "time for another extension of temporary custody," a juvenile court is not required to extend temporary custody if it finds that a child's best interest would not be served by an extension or there is no reasonable cause to believe the child would not be reunified with his or her parents within the period of extension. *See, e.g., In re Da.B.*, 2018-Ohio-689, ¶ 17-18 (8th Dist.); *see also In re J.J.*, 2024-Ohio-1049, ¶ 39 (8th Dist.) ("R.C. 2151.353(G) provides that 'the statutory term for a temporary custody order is one year. While the agency is permitted to seek up to two six-month extensions of temporary custody,' that decision is left to the sole discretion of the agency."), quoting *In re J.A.*, 2022-Ohio-1324, ¶ 36 (8th Dist.); R.C. 2151.415(D)(1) ("The court may extend the temporary custody order of the child for a period of up to six months, if it determines at the

hearing, by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension."). "A parent 'is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal.'" *In re J.J.* at ¶ 39, quoting *In re A.L.A. & A.S.A.*, 2011-Ohio-3124, ¶ 108 (11th Dist.).

{¶ 55} Based on the record before us, we cannot say that the juvenile court erred in finding that M.T. could not be placed with Mother within a reasonable time or should not be placed with Mother. As it relates to Mother, the juvenile court's findings under R.C. 2151.414(B)(1)(a), (E)(1) and (4) were supported by sufficient, clear and convincing evidence and were not against the manifest weight of the evidence. Mother's first assignment of error is overruled.

### Determination that Permanent Custody was in the Best Interest of the Child

{¶ 56} In her second assignment of error, Mother contends that the juvenile court erred in finding that permanent custody was in M.T.'s best interest because the best-interest factors under R.C. 2151.414(D)(1) "weighed strongly against permanent custody."

{¶ 57} R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest, the court "shall consider all relevant factors," including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

{¶ 58} The best interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59 (8th Dist.). Indeed, R.C. 2151.414(C) expressly prohibits the juvenile court from considering the effect the granting of permanent custody to the agency would have upon the parents. *In re J.C.-A.*, 2020-Ohio-5336, ¶ 80 (8th Dist.). Although the juvenile court is required to consider each relevant factor in determining what is in a child's best interest under R.C. 2151.414(D)(1), no one factor is required to be given greater weight than the others. *In re A.L.*, 2024-Ohio-1992, ¶ 31 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Further, only one of the factors need be resolved in favor of permanent custody to terminate parental rights. *In re R.M.*, 2024-Ohio-1885, ¶ 60 (8th Dist.); *In re J.C.-A.* at ¶ 80; *In re N.B.* at ¶ 53.

**{¶ 59}** Mother contends that the juvenile court erred in determining that permanent custody was in the best interest of M.T. because (1) "the worker testified that M.T. is bonded to Mother," (2) "[t]here was no testimony provided regarding any bond between foster parents and the child" and (3) "[w]hile all children require a legally secure placement, M.T. has been with the same foster family all his life and there was no testimony that the placement would be disrupted" if the juvenile court granted a six-month extension of temporary custody rather than permanent custody.

**{¶ 60}** The record reflects that the juvenile court considered each of the relevant R.C. 2151.414(D)(1) factors, the evidence presented at the permanent custody hearing and the recommendation of the guardian ad litem in determining that an award of permanent custody to the agency was in M.T.'s best interest. In its November 21, 2023 journal entry, the juvenile court identified the factors it considered as follows:

> In considering the best interests of the child, the Court considered the following relevant factors pursuant to 2151.414(D)(1): The interaction and interrelationship of the child with his parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether he has been in temporary custody of a public child services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; his need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and whether any of the factors in Division (E)(7)-(11) of Section 2151.414 apply in relation to the parents and child.

In addition to its findings related to 2151.414(B)(1)(a) and (E)(1), (4) and (13) discussed above, the juvenile court also found that (1) M.T. was placed in agency custody upon his release from the hospital on August 12, 2022, (2) M.T. had been adjudicated dependent and placed in the temporary custody of the agency on November 14, 2022, (3) the children were placed together in the same foster home, where E.T. had been since she was three months old and (4) "[t]his is the only home M.T. has ever known as this is where he was placed after coming home from his birth in the hospital." The juvenile court also indicated that no relative or other interested person had filed, or been identified in, a motion for legal custody of M.T.

{¶ 61} Following careful consideration of the evidence presented at the permanent custody hearing, we cannot say that the juvenile court erred in concluding that granting permanent custody of M.T. to the agency was in M.T.'s best interest.

{¶ 62} Here, it could be reasonably said that virtually all of the R.C. 2151.414(D)(1) factors favor granting permanent custody to the agency. With respect to Mother's claim that House's testimony established that M.T. was bonded with Mother, House testified only: "When they [E.T. and M.T.] come for the visit with mom, they do acknowledge mom as well at the time sometimes. Sometimes they don't. They don't want to be bothered." Contrary to Mother's assertion, evidence was presented that M.T. had a strong relationship with his foster caregiver. The guardian ad litem reported:

The minor children have lived virtually all their lives with their caregiver, who has worked with both of them substantially. The children have made great strides in their development, mostly thanks to the caregiver and the physical and occupational therapy teams that the Agency has referred to her. . . .

Both minor children in this matter are under three years old, and both remain very vulnerable. The plus here is that they are in an excellent foster home, with a loving caregiver. Their needs are more than met in the caregiver's home, and the extended family are quite familiar with E.T. and M.T. They adore the minor children.

. . .

[T]hese children are in need of permanency and a stable, loving home. Permanent custody to the Agency can achieve that, and I would like to see them stay in the current caregiver's home for that purpose.

{¶ 63} Evidence was also presented that M.T. was bonded with his half-sister. The guardian ad litem reported that "E.T. loves M.T. dearly and will often try to 'mother' him by pulling a blanket over him or trying to attend to her half-brother's needs." House testified that both children were "thriving" in their foster placement together.

{¶ 64} M.T. has never lived with Mother and, by the time of the permanent custody hearing, had already been out of her care for nearly 15 months. As stated above, after receiving more than two years of services directed to remedying the problems that caused M.T. and his sister to be removed from Mother's care, Mother is not yet at a place where she could independently parent M.T. and consistently meet his basic needs, including providing a safe and secure, permanent home for him, and there is no indication in the record that she would be able to do so at any reasonable time in the future.

{¶ 65} Every termination-of-parental-rights case involves the difficult balance between maintaining a natural parent-child relationship and protecting the best interest of a child. However, in determining what is in a child's best interest, the existence of a biological relationship or even a "good relationship" or bond with a parent is not controlling in and of itself. *In re R.D.*, 2022-Ohio-4519, ¶ 61 (8th Dist.); *In re J.B.*, 2013-Ohio-1704, at ¶ 111; *In re T.W.*, 2005-Ohio-6633, ¶ 15 (8th Dist.). "A child's best interests require permanency and a safe and secure environment." *In re E.W.*, 2014-Ohio-2534, ¶ 29 (8th Dist.). Although "[f]amily unity and blood relationship are vital factors to carefully and fully consider," the "paramount consideration" is always the best interest of the child. *In re R.D.* at ¶ 61; *In re J.B.* at ¶ 111.

{¶ 66} In granting permanent custody of M.T. to the agency, the juvenile court specifically noted that it had "already denied permanent custody once" in the case of M.T.'s half-sister, K.T., "in the hopes" that Mother would do what she needed to do to be reunified with K.T. and that it was not in the children's best interest to continue to deny them permanency. The guardian ad litem recommended that permanent custody be granted to the agency, stating that Mother was "still in too much of a risky situation, and . . . her circumstances have not advanced enough in the past two years to remedy the risk" to her "very vulnerable" children.

{¶ 67} Mother does not dispute that M.T. is in need of a legally, secure permanent placement. "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a

child will live in safety with one or more dependable adults who will provide for the child's needs." *In re Z.F.*, 2024-Ohio-1698, ¶ 45 (1st Dist.), quoting *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). While Mother may love M.T. and may desire to be a supportive parent, the record shows that she was "unable to provide what R.C. 2151.414(D)(1)(d) envisions." *In re Z.F.* at ¶ 46.

**{¶ 68}** The juvenile court did not err in determining that granting permanent custody to the agency was in M.T.'s best interest. The record reflects that the juvenile court considered the relevant best-interest factors and its finding that it was in M.T.'s best interest to grant permanent custody to the agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's second assignment of error is overruled.

**{¶ 69}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MARY J. BOYLE, J., CONCUR