[Cite as *In re N.B.*, 2025-Ohio-2780.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE: N.B., ET AL.                    :

                                       :              No. 114732

Minor Children                         :

                                       :

[Appeal by Father]                     :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 7, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-21-911152 and AD-22-912733

---

*Appearances:*

Law Office of Anthony J. Richardson, II, LLC, and
Anthony J. Richardson, II, *for appellants.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

EMANUELLA D. GROVES, P.J.:

{¶ 1} Appellant-father ("Father") appeals the juvenile court's decisions granting the Cuyahoga County Division of Children and Family Services' ("CCDCFS") motions to modify temporary custody to permanent custody of Father's

children, N.B. (d.o.b. 12/08/21) and K.B. (d.o.b. 12/08/22) (collectively "Children").[1] Upon review, we affirm the juvenile court's decisions.

## I.     Facts and Procedural History

{¶ 2} In December 2021, CCDCFS filed a complaint for dependency and temporary custody of N.B. along with a motion for predispositional temporary custody.[2] Emergency temporary custody was granted after Father stipulated to the motion. A guardian ad litem ("GAL") was appointed for N.B., who was adjudicated as a dependent child and committed to the temporary custody of CCDCFS in March 2022. CCDCFS moved for an extension of temporary custody in October 2022. The GAL filed a report recommending the continuation of CCDCFS's temporary custody of N.B. since additional time was needed for Children's parents to complete case-plan objectives. After consideration and upon agreement of the parties, the juvenile court granted the motion and extended CCDCFS's temporary custody of N.B. until June 2023.

{¶ 3} In December 2022, CCDCFS filed a complaint for dependency and temporary custody of K.B. along with a motion for predispositional temporary custody.[3] Emergency temporary custody was granted after Mother and Father

---

[1] This appeal addresses the parental rights and responsibilities of Father only. To date, no appeal had been filed by Children's mother ("Mother").

[2] The complaint was amended in March 2022, and Mother and Father admitted to the allegations contained therein.

[3] The complaint was amended in April 2023 after Father's paternity was established. Paternity was also established during the pendency of N.B.'s case.

stipulated to the motion. The same GAL was appointed for K.B., and she filed a report recommending that temporary custody be granted to CCDCFS. In May 2023, K.B. was adjudicated as a dependent child and committed to the temporary custody of CCDCFS.

{¶ 4} Weeks later, CCDCFS filed motions to modify temporary custody to permanent custody in both cases. At an annual review in N.B.'s case, the juvenile court held the motion in abeyance and continued its prior temporary custody order. In K.B.'s case, Father filed a motion for unsupervised overnight visitation, noting that he had been enjoying successful, unsupervised visits with N.B. for over five months. Children's GAL also filed amended reports in each case. Therein, GAL suggested that permanent custody was in Children's best interest and recommended that they be committed to CCDCFS's permanent custody.

{¶ 5} In November 2024, a trial was held on CCDCFS's motions to modify temporary custody to permanent custody. CCDCFS presented the following evidence.

{¶ 6} First, Dr. Lynn Williams ("Dr. Williams"), a forensic psychologist in the juvenile court's diagnostic clinic, offered testimony regarding her psychological evaluation of Father, which was presented in conjunction with her written report.[4]

---

[4] Dr. Williams' written report of Father's psychological evaluation was admitted without objection. The report included sources of information; a summary of the current situation; relevant background information about Father's family, significant relationships, education, employment, medical history, mental health, substance abuse, and legal history; the results from Father's mental status examination and psychological testing; and Dr. Williams' diagnostic opinions and recommendations.

Dr. Williams explained that the purpose of her evaluation was to assess any psychological issues that would impact parenting. To complete the evaluation, Dr. Williams reviewed collateral records, interviewed Father, and administered psychological testing. Dr. Williams explained that Father was aware that N.B. was diagnosed with autism and acknowledged that the lifelong diagnosis may cause behavioral issues. However, Dr. Williams indicated that Father believed N.B. "may grow out of it" by "cramming three years of developmental skills." Dr. Williams further indicated that Father believed that N.B. required discipline to correct behavioral issues.

{¶ 7} During her evaluation of Father, Williams learned that there had been multiple incidents of domestic violence between Father and Mother involving police. This history with domestic violence raised concerns regarding what discipline might mean to Father. Williams also learned that Father had an extensive history of mental-health services beginning when he was young and was previously diagnosed with anxiety, depression, and posttraumatic stress disorder. Dr. Williams determined that Father was bipolar with maladaptive mixed personality traits.

{¶ 8} Williams further testified that Father's intellectual assessment revealed some processing impairments: Father took over twice as long to complete the assessment compared to a "typical administration," seemed anxious and obsessive, had difficulty looking outside of his own perspective, and had trouble recognizing his limitations. Acknowledging that Father tested in the average range for cognitive ability and attended several parenting programs, Dr. Williams

expressed concerns that he was not grasping, integrating, and applying the material to his visits with Children because of these processing issues.[5] Dr. Williams had further concerns regarding narcissism, which caused him to focus on his own perspective and have difficulty understanding others' perspectives and integrating them. Dr. Williams opined that while Father was young and there was still time for development, Father's processing issues would probably be "a longer[-]term thing" based on his history with supportive services.

{¶ 9} With this information in mind, Dr. Williams concluded that Father's diagnoses would affect his ability to parent a child, especially one with significant special needs, since they "would definitely impair in terms of processing, . . . taking the information that's given to him, the amount of time it would take him to process that, and then also interfere with an ability to apply that and apply it consistently and apply it independently without that support." Dr. Williams' report further reiterated her opinion that Father would "need supportive services to meet [C]hildren's basic necessities at present as well as throughout their childhood and adolescent developmental phases."

{¶ 10} Next, Aimee Collins ("Collins"), a social worker from CCDCFS's Sobriety Treatment and Recovery Team, offered testimony about her assignment to Children's cases. Collins testified that CCDCFS first became involved with the family when N.B. was born in December 2021. There were concerns regarding Mother and

_____

[5] We note that Dr. Williams did not observe Father with Children and her conclusions were based upon her psychological evaluation of Father.

Father's mental health, domestic violence, substance abuse, parenting, and housing. Mother tested positive for marijuana during her pregnancy and at N.B.'s birth. Collins explained that Father was not allowed in the delivery room because of physical altercations with Mother during her pregnancy. There were also reports that Mother sometimes acted as the aggressor. Despite service referrals, domestic-violence incidents between Mother and Father continued.

{¶ 11} Collins investigated one such incident that occurred in June 2024. Collins learned that Mother and Father had a verbal altercation; Father's mother ("Paternal Grandmother") intervened; and Mother, who was intoxicated, attacked Paternal Grandmother. Father told Collins that he was not home when the incident occurred, had no contact with Mother, and did not know where she was. Collins also learned that there were multiple prior incidents where police were called to the home.

{¶ 12} Collins advised that Father did engage in some domestic violence classes, but she was unable to locate a certificate of completion. As far as she knew, he completed the program and was educated on domestic violence. However, the parent's history with domestic violence still concerned Collins, especially since new incidents occurred after the classes were taken, including the incident in June 2024. At the time of trial, Collins testified that she did not have any concerns regarding Father's substance abuse.

{¶ 13} Collins further advised that Father had been consistent with mental-health services, which included a referral to the juvenile court's diagnostic clinic.

Collins made this referral after concerns were raised regarding Father's cognitive ability. Collins also had concerns regarding Father's perception of the information that he was receiving about N.B., N.B.'s autism, behavioral issues, and different parenting techniques to help N.B. Collins explained that Father attended N.B.'s doctor's appointments and autism assessment and diagnosis, which revealed that N.B. would need substantial support throughout his life. She stated:

> [D]uring a lot of them, he would always go back to, "Oh, my child's just spoiled. He just needs discipline. He's spoiled. He just needs discipline." Even when the doctor is sitting there talking to him about the developmental delays, he would go back to "my child is spoiled." So I just had some concerns with him actually processing that information and fully understanding that this wasn't that his son was spoiled, this was a developmental delay.

(Quotations added.) Collins also had conversations with Father regarding N.B.'s special needs:

> [A]t the start, [Father] was very adamant about how he hasn't been able to parent his children and he hasn't been able to educate his children and/or discipline them, and how, you know, [N.B.] just needs some discipline. Now, towards the end here, he has began to understand a little bit that [N.B.] has some developmental delays, but he still believes that, you know, through discipline and education, he could correct this. And then he has asked for [N.B.] to have a — to have a second opinion done on [N.B.] for his autism. . . . [M]y impression in discussing [N.B.'s] future is that [Father] does believe that [N.B.] is going to grow out of the autism and that it is going to get better through him trying to educate [N.B.] and/or discipline [N.B.].

Collins reviewed Father's psychological evaluation and believed it was consistent with her observations during her time with Father. While K.B. had not been diagnosed with any special needs, Collins had some concerns and spoke to her pediatrician about a developmental-specialist referral.

**{¶ 14}** Collins further advised that Father completed two parenting classes and was referred to a parenting coach since concerns remained over Father's ability to handle both Children at the same time. When Collins received the case, Father's visitations took place for two hours each week at a library and were supervised by a parenting coach. Collins subsequently modified visitations to take place at Father's home at the end of June or beginning of July 2024. Home visits were supervised for two hours at first but were later unsupervised for five hours with a Positive Education Program ("PEP") worker and family advocate checking in.

**{¶ 15}** Collins offered testimony regarding her observations of Father's visits:

> The visits in the library, they did go okay. There were some concerns because the [C]hildren did seem to spend a lot of time in the stroller. And [Father] did focus a lot on [N.B.] versus [K.B.], and he spent a lot of time focusing there. Part of the reason we moved them to the home was because the library was such an open place and [N.B.] did tend to run. . . . So we kind of felt that if they were in a more confined space, maybe he could handle both [C]hildren a little bit easier, because he did struggle with – he would leave [K.B.] in the stroller to go run after [N.B.]. And even if that meant leaving the children's area to go to a different area to catch up to [N.B.].
>
> . . .
>
> And in the home, he seemed to do well with them. He struggled a little bit with — he was trying to get [N.B.] to sit or stay in one place, which [N.B.] struggles with that. He struggles to sit still. He struggles to stay in one place. He likes moving and running, bumping into things. It's all some sensory seeking behaviors that [N.B.] has due to the autism. But overall he wasn't doing too bad with the [C]hildren in the home.
>
> . . .

During the two hours, I didn't really have too much concern with him parenting the [C]hildren long term, which is why we kind of extended the visits, and that he was attending the doctor's appointments and hearing the autism. He was also open to having the PEP worker come into his home with him to give him some tips on how to handle [N.B's] autism, which is why we did extend the visits and go to the unsupervised.

{¶ 16} However, Collins advised that she began having more concerns about the care Children were receiving after the five-hour visits began. Collins explained that Father "was adamant over doing flashcards with the [C]hildren and having the [C]hildren sit still." Collins advised that Children were one and two years old at the time and, despite having multiple discussion with Father that flashcards were not developmentally appropriate and providing alternatives, he continued to use them to teach Children the alphabet. Collins testified that Father was "adamant that the [Children] should be further along in their education and that they should know more at this point in time." While Collins acknowledged that there was nothing wrong with a parent wanting to educate their children, she explained:

It gave me concerns because it wasn't necessarily developmental[ly] appropriate the way he was going about it. Not necessarily trying to teach the kids the alphabet. Teaching the kids the alphabet was a great option, especially at that age. It was that he wanted [C]hildren to sit still and do these flashcards. And despite us talking to him about how that wasn't appropriate and that [C]hildren couldn't sit still that long, he still continued to [do] it.

{¶ 17} Collins further expressed concerns regarding Father's understanding of sensory issues N.B. might be experiencing due to autism, like not wanting to sit in the bathtub, and Father's habit of leaving Children in their highchairs for extended periods of time while he left to watch the television. Collins also noted that

Father "completely ignores" K.B. and "seems to put more focus on [N.B.] and pay more attention to what [he] is doing." Collins advised that K.B. "seem[ed] to be a little withdrawn during the visits" and did not seek out Father for comfort. Finally, Collins expressed concern that Father was not appropriately feeding Children.

{¶ 18} These visits stopped in November 2024 after CCDCFS learned of the June 2024 domestic-violence incident. Collins explained that the visits were stopped even though the incident occurred five months earlier because there were concerns that Mother was still coming in the home and CCDCFS did not want there to be a domestic-violence incident while Children were there. Collins further explained that loud arguments or noises could upset N.B. and "could se[nd] him into a downward spiral of a tantrum or hitting or . . . even him trying to run away from the scene." Collins also advised that there were concerns about Paternal Grandmother living or staying in the home since she had a long history of substance abuse and with CCDCFS.

{¶ 19} Collins advised that N.B. had remained in CCDCFS's custody since December 2021. Both Children were currently placed together in foster care, and CCDCFS planned to investigate a possible placement with Father's sister for eventual adoption if permanent custody was granted.[6] At the time of trial, N.B. was on waiting lists for occupational, physical, and speech therapy and scheduled for an

---

[6] Father's sister contacted CCDCFS three days prior to trial to express interest in adopting Children. Prior to that day, no relatives were willing or able to care for Children and Father had not suggested his sister as a caregiver for Children.

applied-behavioral-analysis-therapy assessment. Children played and bonded with their foster mother and sought comfort from her and her children.

{¶ 20} Ultimately, Collins believed that, despite Father's completion of services, permanent custody was in the best interests of Children

> [b]ecause through my time on the case, [Father] has struggled with parenting both [C]hildren appropriately. He struggles to pay attention to both of them at the same time. He struggles to change their diapers, to keep them out of the highchair for extended periods of time. And that he struggles to process the information that's given to him over ways to help [N.B] with his special needs and/or ways to even just educate both [C]hildren that could better them and to parent them.
>
> . . .
>
> I believe [Father], at this time, cannot handle both children and parent them appropriately.

Collins further testified that she believed permanent custody was in Children's best interest because N.B. would receive necessary services and K.B. seemed very withdrawn from Father and did not seek comfort from or appear to be bonded with him. Collins testified that were no services that she was aware of that would change her opinion about Children's best interests anytime in the foreseeable future.

{¶ 21} Next, Cleveland Police Officer Elaine Ciacchi ("Officer Ciacchi") offered testimony regarding the June 2024 incident. Officer Ciacchi testified that she and her partner responded to a domestic-violence call at Father's home. Officer Ciacchi and her partner were informed by dispatch that police had previously responded to multiple domestic-violence calls at the address. Father was not there when they arrived. Officer Ciacchi first spoke to Paternal Grandmother, who had

fresh scratches on her face.  Officer Ciacchi then spoke with Mother, who was "highly intoxicated," and learned that the two women had gotten into a verbal argument. Officer Ciacchi further learned that Father was previously home and involved in a verbal argument with Mother, resulting in a physical altercation between Paternal Grandmother and Mother.  Father was present during the initial altercation but left the home before Paternal Grandmother called 9-1-1.   During the officer's questioning of Mother, they learned that Father and Mother shared another son who was home during the incident.  Officer Ciacchi located a five-month-old child upstairs in a bassinet covered by "a big comforter that shouldn't have been on the baby at that time."  Mother was arrested, and the baby was left with Paternal Grandmother since she was not intoxicated and was able to care for him.

{¶ 22} Next, PEP supervisor and childhood consultant and trainer Lauren Woods ("Woods") offered testimony regarding her work with Children, Father, and Children's foster mother.  Related to her work with Father, Woods explained that she first met Father at N.B.'s autism assessments and, after observing their interactions, offered to provide support during his visits.  Woods testified

> My goals were to help him understand [N.B.'s] needs, to help him understand what autism is, the sensory needs that he has, and different ways to redirect his behavior.  And we also worked a lot on teaching through play and realizing that behavior — [N.B.'s] challenging behavior wasn't really a choice, but it was a result of his sensory differences in autism.

Woods attended 11 visits with Father and Children, occurring weekly at first and then biweekly.  Woods acknowledged that Father was willing to have her come into

his home and was invested in Children's learning and Children's behavior. Woods explained her experience observing Father and N.B. during the visits as follows:

> When I first went, . . . I took toys and I took different things so that I could model teaching through play and model the interaction and model sharing. And then that seemed to be a little bit overwhelming for [N.B.] and [Father], and he seemed kind of frustrated that what I was doing was disrupting his plan for the visits. And so then I stopped bringing anything to the visits and just provided like some coaching and support when I was there.

Woods also observed K.B., noting:

> At first, it seemed like [K.B.] was really withdrawn. The very first visit that I was there, she literally sat on the couch the whole time that I was there, didn't even climb down from the couch or say anything. She ha[d] gotten more active as the visits [went] on, but what I've noticed is that if she need[ed] something, she — I have not seen her cue, successfully cue, [Father] or [Paternal Grandmother] for her needs. She'll come to me or — and then I thought maybe it was just her, but then I observed her in the foster home and at daycare, as well, and she d[id] actively seek to get her needs met in those — in those environments. She s[ought] attention and affection in those environments.

{¶ 23} Woods advised that she had some concerns regarding Father's use of flashcards, his ability to manage Children, and his understanding of N.B.'s sensory needs. To address these concerns, Woods attempted to assist Father by teaching him other learning techniques, providing information about Children's behaviors and how to appropriately address them, and making suggestions regarding sensory interventions. However, Woods did not believe that Father implemented those techniques and suggestions. Woods stated that verbal or physical arguments in Father's home would raise concerns, especially considering N.B.'s diagnosis,

because children are susceptible to their environment and N.B. had a difficult time identifying and managing his emotions and regulating sensory things.

{¶ 24} Woods further testified that Father referred to N.B.'s behaviors as "being bad" and talked to her about discipling N.B. because of those behaviors. Woods advised that she had multiple conversations with Father discussing his discipline techniques and why they would not be successful considering N.B.'s diagnosis. Woods also observed Paternal Grandmother addressing N.B.'s behaviors in a similar way. Woods expressed concern that Father and Paternal Grandmother did not understand what N.B.'s autism diagnosis truly meant "[b]ecause so much of [N.B.'s] behavior is really not a choice. He's not choosing to give his dad a hard time or choosing to melt down. He's just having trouble navigating the environment and having trouble expressing himself, and so he's not able to do that in a way that we would consider appropriate." Woods testified that N.B. would continue to have challenges throughout his life but could learn to cope if certain needs were met by his caregiver:

> I believe [N.B.] needs structure and consistency, that he needs someone who understands what his needs are, who can provide a very sensory environment, who can take him to the services that he needs, and also be able to implement the recommendations from those services. Because the brain isn't changed with 30 minutes to 50 minutes of therapy a week. That's not going to help change his speech and help change his behavior. He needs somebody who can carry that through.

{¶ 25} Woods was also concerned that Father did not recognize K.B.'s needs since she expressed them differently than N.B. Woods explained, "I'm not trying to say that he was deflecting her and not giving her food and drink, but she wasn't

asking for it as readily [as N.B.], and so — and then there were times that she would be like reaching for a toy or struggling to get something, and he just kind of walked on by instead of helping." Woods advised that K.B. would run to her when she was scared, even when Father was present. Woods believed that K.B. needed to be assessed for autism since she was developing some sensory sensitivities and shut down when she became upset. Woods believed that K.B. "need[ed] structure and consistency and a caregiver who is attuned to her needs so that — because she doesn't always signal feelings, so that when she does signal, those bids for attention are responded to." Based on her observations, Woods had ongoing concerns about whether Father would be able to meet these needs.

{¶ 26} Finally, Children's foster mother ("Foster Mother") offered testimony regarding their placement in her home, mannerisms, needs, and routines. Foster Mother testified that N.B. was "intense" and his behaviors were "extreme," however, her background as a multi-handicapped teacher's assistant and home visitor helped her identify and meet N.B.'s needs. Foster Mother explained, "I have to re-adapt a lot of things that I do for him. Just try to go with what seems to be more comfortable for him. . . . Limit anything that's not routine for him. . . . He needs routine. And I just talk to him, and I use some of the therapies that he's — he's been working with a few people on." Foster Mother advised that she had been part of all of N.B.'s services. Foster Mother testified that she had seen "some improvement" in N.B.'s behavior since he was placed in her home and she began working with him. Foster Mother further testified that she started to have concerns

about some of K.B.'s new behaviors as well. Foster Mother also expressed concerns about Children's transition after visits at Father's home:

> N.B. is always fussy. It's always a need — they're always looking for — well, him — looking for food. Usually, when the driver drops him off, he's screaming to the top of his lungs. More often than not, he was — he would be soiled, like soaking through his diaper. And it takes a couple of days for his behavior to kind of . . . calm down [in school and at home].
>
> . . .
>
> K.B. [is] about the same. Super fussy, extremely clingy. She is also, more often than not, was soiled, which irritated her a lot. Her bottom would be sore for days after each and every time. And daycare noticed that she was also extremely clingy and more fussy after her visits.

Foster Mother advised that Children were a part of her life, and she was open to the idea of adoption.

{¶ 27} CCDCFS rested and Father offered testimony about his housing, employment, and relationships with Children and Paternal Grandmother. Acknowledging that N.B.'s autism "may be a problem," Father testified that he often holds N.B. accountable because "[h]e is a very intelligent child." Father advised that despite going to all of N.B.'s meetings and appointments, he was not made aware of the results of N.B.'s autism assessment. On cross-examination, Father acknowledged that he did not attend N.B.'s final-diagnosis appointment and had multiple conversations with Collins and Woods about the results and things he could do to support N.B. While Father believed that N.B.'s diagnosis was "somewhat correct," he wanted N.B. to be reevaluated "in a system that may fit him better, just because I don't like the hospital." Father further testified that he had some

experience with autism because his brother, whom he was close to, was diagnosed as "mildly autistic."

{¶ 28} Related to the domestic-violence incident in June 2024, Father testified that Mother came to his home intoxicated with a baby because she needed help. Father advised that he was not present during Mother and Paternal Grandmother's altercation because he left to avoid confrontation. On cross-examination, Father testified that he did not "know much about the child at all" that was found in the bassinet and left with Paternal Grandmother. Father also denied on cross-examination that the police responded to his home on multiple occasions because of arguments with Mother. Father testified that he had not seen Mother since the June 2024 incident.

{¶ 29} Father rested, and the GAL advised that she had not heard anything during trial that caused her to depart from her written report and recommendation that permanent custody be granted to CCDCFS. The GAL testified that she had regular contact with Father since the beginning of Children's cases. The GAL advised that she had been to Father's home, attended library visits, and made appointments with him; however, he was not present. According to the GAL, she had multiple conversations with Father and Father's counsel about consistency and her concerns regarding Father's ability to meet Children's needs.

{¶ 30} The GAL testified that she had ongoing concerns regarding Father's ability to parent Children. The GAL advised that Father struggled to maintain housing and employment. The GAL further advised that Father's relationship with

Paternal Grandmother was troublesome since she had a "concerning past" and stayed in Father's home so frequently. The GAL also expressed concerns that Father "open[ned] the door to [Mother], who's very problematic in this case" and "presents a risk" to Father and Children. The GAL advised that Father never mentioned the June 2024 incident and she only recently learned of its occurrence. The GAL believed Father was "[feigning] that he doesn't know anything about [the] five-month-old." She stated:

> I believe it's his child, which is very concerning. That there is a third child. That there's little, if anything, known. That there's still volatility in the household. I don't know why [Father] would have chosen to leave that day. He should have been the one calling the police when it escalated and [M]other was intoxicated and she has this baby, if he's using good judgment. So judgment is still concerning.

{¶ 31} On November 26, 2024, the juvenile court issued journal entries with extensive findings of fact, including that Father's testimony was not credible, and conclusions of law. The juvenile court granted CCDCF's motion to modify temporary custody to permanent custody, committed Children to the permanent custody of CCDCFS for the purposes of adoption, and terminated Mother and Father's parental rights and responsibilities.

{¶ 32} Father appeals, raising two assignments of error for review.

### Assignment of Error No. 1

The trial court committed reversible error by terminating parental rights under R.C. 2151.414.

The trial court committed error by terminating familial rights where R.C. 2151.414 is unconstitutional as applied.

## II.    Law and Analysis

### A. Standard of Review

{¶ 33} The Ohio Supreme Court recently clarified that sufficiency of the evidence and/or manifest weight of the evidence are the proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and terminate parental rights, depending on the nature of the arguments presented by the parties.  *In re Z.C.*, 2023-Ohio-4703, ¶ 18 (holding remand was required where an appellate court applied the abuse-of-discretion standard).   Sufficiency of the evidence and manifest weight of the evidence are two distinct and different concepts:  "'sufficiency is a test of adequacy'" while manifest weight depends on the evidence's ""'effect in inducing belief'.""  *Id.* at ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).  The court explained:

> "Whether the evidence is legally sufficient to sustain a verdict is a question of law." [*Thompkins*] at 386.  "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'"" *Bryan-Wollman v. Domonko*, [2007-Ohio-4918,] ¶ 3, quoting *Thompkins* at 386, quoting Black's at 1433.

> But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* [*v. Volkman*, 2012-Ohio-2179,] ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences,

consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 13-14. Finally, we note that although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re M.T.*, 2024-Ohio-3111, ¶ 40 (8th Dist.), citing *In re L.H.*, 2024-Ohio-2271, ¶ 29 (8th Dist.).

### B. Permanent-Custody Determination

{¶ 34} In his first assignment of error, Father appears to argue that the juvenile court's permanent-custody determinations are against the manifest weight of the evidence. Father argues that the terminations of his parental rights under R.C. 2151.414 are not supported by clear and convincing evidence in the record.

{¶ 35} Both the U.S. and Ohio Supreme Courts recognize that parents have a basic and fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d

155, 157 (1990); *In re C.F.,* 2007-Ohio-1104, ¶ 28. Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re K.M.,* 2015-Ohio-4682, ¶ 15 (10th Dist.), citing *In re Cunningham,* 59 Ohio St.2d 100, 106 (1979). Therefore, the "[t]ermination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child." *In re M.S.,* 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise,* 96 Ohio App.3d 619, 624 (9th Dist. 1994). By terminating parental rights, the goal is to create a more stable life for dependent children and to facilitate adoption to foster permanency for children. *In re L.W.,* 2017-Ohio-657, ¶ 21 (8th Dist.), quoting *In re N.B.,* 2015-Ohio-314, ¶ 67 (8th Dist.).

{¶ 36} The termination of parental rights is governed by R.C. 2151.414 and determined by a two-prong test established therein. *In re J.C-A.,* 2020-Ohio-5336, ¶ 78 (8th Dist.), citing *In re M.H.,* 2002-Ohio-2968, ¶ 22 (8th Dist.). Before a court may terminate parental rights and award permanent custody of a child to the proper agency, it must determine by clear and convincing evidence that (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) an award of permanent custody is in the child's best interest. R.C. 2151.414(B)(1).

{¶ 37} "'Clear and convincing evidence is that measure or degree of proof, which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.,* 2023-Ohio-4703, at ¶ 7, quoting

*Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. In instances where clear and convincing proof is required, "'a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id*. at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990), citing *Ford v. Osborne*, 45 Ohio St. 1 (1887), paragraph two of the syllabus.

### 1. First Prong: R.C. 2151.414(B)(1)(a)-(e) Factors

{¶ 38} Pursuant to R.C. 2151.414(B)(1):

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing . . ., by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that *any* of the following apply:

(a) The child is not abandoned or orphaned [or] has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . .

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

"Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.*, 2017-Ohio-657 at ¶ 28 (8th Dist.).

{¶ 39} "When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E)." *In re L.H.*, 2024-Ohio-2271, at ¶ 34 (8th Dist.), citing *In re A.V.*, 2014-Ohio-5348, ¶ 58 (8th Dist.), *In re R.M.*, 2012-Ohio-4290, ¶ 14 (8th Dist.), and *In re B.P.*, 2019-Ohio-2919, ¶ 13 (8th Dist.). After considering all relevant evidence, the court must enter a finding that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent if the court determines, by clear and convincing evidence, that one or more of 16 enumerated factors exist as to each of the child's parents. R.C. 2151.414(E). Relevant to this appeal, these factors are as follows:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> . . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

. . .

(10) The parent abandoned the child.

. . .

(16) Any other factor the court considers relevant.

R.C. 2151.414(E).  Only one of the enumerated factors under R.C. 2151.414(E) is required for the court to make a finding under R.C. 2151.414(B)(1)(a).  *In re L.W.*, 2019-Ohio-1343, ¶ 29 (8th Dist.), quoting *In re Glenn*, 139 Ohio App.3d 105, 113 (8th Dist. 2000), and citing *In re R.M.*, 2012-Ohio-4290, ¶ 14 (8th Dist.) (The existence of only one factor will support the court's finding that the child cannot be reunified with the parent within a reasonable time.).

{¶ 40} Here, the juvenile court found that two of the R.C. 2151.414(B)(1) conditions exist.  First, the juvenile court found that N.B. was in CCDCFS's temporary custody for 12 or more months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d).  Second, the juvenile court found that Children could not or should not be placed with either of Children's parents within a reasonable time under R.C. 2151.414(B)(1)(a).  In so finding, the juvenile court determined that four R.C. 2151.414(E) factors applied.  Under R.C. 2151.414(E)(1), the juvenile court found that Mother and Father failed continuously and repeatedly to substantially remedy the conditions causing Children to be placed outside of the home despite

reasonable case planning and diligent efforts by CCDCFS to assist them. The juvenile court also found that "the parent" demonstrated a lack of commitment toward Children by failing to regularly support, visit, or communicate with them or by other actions demonstrating an unwillingness to provide an adequate permanent home under R.C. 2151.414(E)(4). The juvenile court further found that Mother abandoned Children under R.C. 2151.414(E)(10). Finally, the juvenile court considered the special needs of N.B. under R.C. 2151.414(E)(16).

{¶ 41} In making these findings, the juvenile court highlighted the "serious issue" of Mother and Father's domestic violence, noting that "[t]here have been incidents of domestic violence between the parents since [domestic-violence] classes were supposed to have been completed." The juvenile court further referenced testimony contradicting Father's assertions regarding his lack of contact with Mother; the June 2024 incident; his relationship with the five-month-old child found in the bassinet; and Paternal Grandmother's living arrangements with Father despite her long and ongoing history with CCDCFS. The juvenile court advised that it did not find Father's testimony to be credible. The juvenile court also highlighted Father's inability to meet Children's needs, explaining:

> The big issue is Father's ability to safely address and manage N.B.'s special needs stemming from his autism. N.B. has been removed from several daycare centers, and he has disrupted a foster home placement. N.B. will need substantial support throughout his life to manage this condition. Four different therapies have been recommended, and Children are on a strict daily routine. Father does not grasp the kind of support N.B. will need. CCDCFS, GAL, Dr. Williams, and Woods, the parenting coach for Father, all share the same concern about Father's ability to safely manage N.B.'s special needs. Further extensions of

temporary custody and more services will not remedy this concern as N.B. has already been in custody for three years and these concerns still exist.

Dr. Williams from the Court Diagnostic Clinic testified that Father needs ongoing support, but this case has already been open since 2021. Father has difficulty looking outside his own perspective which raises concerns about his ability to parent — especially a child with autism.

There was much testimony about whether K.B.'s needs were being met as Father's focus was on N.B. When K.B. needs something, she goes to the case worker or the parenting coach for help instead of Father. It is also possible that K.B. will also have special needs, but currently it is too soon to tell.

. . .

In this case, the Court highlights R.C. 2151.414(C) to note the focus of this determination is for the best interests rather than its effect on the parent.

(Cleaned up.)

{¶ 42} On appeal, Father does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d), satisfying the first prong of the two-part analysis with respect to N.B. since only one factor is needed. Instead, Father focuses his argument on the juvenile court's determination that Children could not be placed with him under R.C. 2151.414(B)(1)(a) based on its findings under R.C. 2151.414(E). Father argues that "the testimony in the record actually supports the opposite of these findings."

{¶ 43} However, clear and convincing evidence within the record supports the juvenile court's findings. While the record reveals that Father engaged in services, remedied some conditions that caused Children to be removed from his

custody, visited Children, and attended many of N.B.'s appointments, clear and convincing evidence was presented that critical conditions and concerns persisted, including domestic violence between Father and Mother and Father's ability to support Children and meet their needs. Notably, witnesses consistently expressed concerns regarding volatility caused by family dynamics and Father's misconceptions about Children's developmental skills and basic needs and beliefs about N.B.'s autism diagnosis and the lifelong challenges he would face. While witnesses continuously expressed concerns regarding Father's ability to support N.B., testimony was also offered that K.B., who may also have special needs, was withdrawn during visits with Father, did not appear to be bonded with him, and did not seek his comfort. Although Father participated in numerous services and attended many of N.B.'s autism appointments, these concerns were not alleviated. Accordingly, the juvenile court did not err in determining that Children could not be placed with Father under R.C. 2151.414(B)(1)(a) based on its findings under R.C. 2151.414(E)(1), (4), and (16), as they relate to Father. Accordingly, the first prong of the two-part analysis for granting permanent custody of Children to CCDCFS is satisfied.

### 2. Second Prong: Children's Best Interest

{¶ 44} In determining the best interest of a child, the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 45} Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in deciding to award permanent custody, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. The Ohio Supreme Court has held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 46} In addition to R.C. 2151.414(D)(1)'s best-interest factors, R.C. 2151.414(D)(2) establishes a list of circumstance that mandates a finding that permanent custody is in the child's best interest. The statute provides:

If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in [R.C. 2151.414(E)] exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody . . . .

(c) The child does not meet the requirements for a planned permanent living arrangement . . . .

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

R.C. 2151.414(D)(2). "R.C. 2151.414(D)(1) and 2151.414(D)(2) are 'alternative means' for determining whether permanent custody is in a child's best interest." *In re R.D.*, 2022-Ohio-4519, ¶ 51 (8th Dist.), quoting *In re J.P.*, 2019-Ohio-1619, ¶ 39-40 (10th Dist.), and citing *In re M.P.* 2010-Ohio-5877, ¶ 35 (10th Dist.). Thus, a juvenile court need not conduct an R.C. 2151.414(D)(2) analysis if it determines that permanent custody is in the child's best interest under R.C. 2151.414(D)(1). *Id.*, citing *In re J.P.* at ¶ 40.

{¶ 47} Here, the juvenile court considered each of the R.C. 2151.414(D)(1) factors and applied the facts of this case to each. With respect to R.C. 2151.414(D)(1)(a) and (c), the juvenile court found that Children had been in CCDCFS's custody since being released from the hospital following their births. Specifically, N.B. had been in CCDCFS's custody for more than two years while K.B. had been in CCDCFS's custody for nearly two years. Considering this length of time and Children's need for legally secure permanent placement under R.C.

2151.414(D)(1)(d), the juvenile court determined that immediate reunification or permanent custody were the only options and reunification was not in Children's best interests. The juvenile court also found that Children were nonverbal and too young to express their wishes under R.C. 2151.414(D)(1)(b); however, the GAL recommended permanent custody be granted to CCDCFS and found that it was in Children's best interests. With respect to R.C. 2151.414(D)(1)(e), the juvenile court found that Mother abandoned Children and had not visited them since January 2023. Finally, the juvenile court determined that R.C. 2151.414(D)(2) applied to N.B.

{¶ 48} On appeal, Father does not challenge the juvenile court's finding under R.C. 2151.414(D)(2), satisfying the second prong of the permanent-custody analysis as it relates to N.B. Father disputes the juvenile court's findings under R.C. 2151.414(D)(1), arguing that each of the factors should not be weighed against him since he has never had the opportunity to care for Children for more than a few hours at a time. Father also claimed that he was not "fairly evaluate[d]" by the GAL.

{¶ 49} Our review of the record reveals that Father made significant efforts to engage in services, remedy some conditions that caused Children to be removed from his custody, visit Children, and attend many of N.B.'s appointments. However, after weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, we cannot say that the juvenile court clearly lost its way in its resolution of evidentiary conflicts and created a manifest miscarriage of justice in finding that permanent custody was in Children's best interests. The record

reveals that Children were placed together with Foster Mother, Children played and bonded with her, and N.B.'s behavior improved while in her care. Foster Mother's background helped her identify and meet N.B.'s needs, and she considered Children to be part of her life. In addition to ongoing concerns regarding Father's ability to support N.B., the record reveals that K.B. was not bonded with Father and he did not recognize her needs since she expressed them differently.

{¶ 50} The record further reveals that Children were placed in CCDCFS's temporary custody since their births in December 2021 and December 2022, respectfully. While Children could not express their own wishes, the GAL opined that permanent custody was in Children's best interest and expressed ongoing concerns regarding Father's ability to parent Children. These concerns were echoed by Dr. Williams, Collins, and Woods. Collins also testified that she believed permanent custody was in Children's best interest and that there were no services she was aware of that would change her opinion anytime in the foreseeable future. Woods offered additional testimony that Children needed structure, consistency, and a caregiver who was attuned to their needs. Thus, there is clear and convincing evidence in the record to support findings of permanency based on the best-interest factors related to Father and set forth in R.C. 2151.414(D)(1)(a)-(d). Consequently, we find that the second prong of the permanent-custody analysis is satisfied.

{¶ 51} Accordingly, we hold that the juvenile court's permanent custody awards are supported by sufficient evidence within the record and are not contrary to that evidence's manifest weight. Having found that the termination of Father's

parental rights is supported by clear and convincing evidence, his first assignment of error is overruled.

### C. R.C. 2151.414's Constitutionality

{¶ 52} In his second assignment of error, Father argues that the termination of parental and familial rights under R.C. 2151.414 is unconstitutional as applied in this case since (1) he was fit to parent and (2) termination of his parental and familial rights was not "the alternative of last resort." Father raises his constitutional challenge for the first time on appeal.

{¶ 53} When a constitutional challenge is not raised before the trial court, an appellate court is not required to address it. *In re L.B.*, 2022-Ohio-4748, ¶ 38 (8th Dist.), citing *In re K.*, 2004-Ohio-4629, ¶ 13 (8th Dist.). Indeed, it is well established that "[t]he 'failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal.'" *In re K.* at *id.*, quoting *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. Because Father did not raise his constitutional challenges below, we decline to consider them now. *See, e.g., In re K.* at *id.*; *In re A.C.*, 2007-Ohio-4654, ¶ 22 (9th Dist.); *In re J.A. V.A.*, 2019-Ohio-4116, ¶ 13 (4th Dist.). Accordingly, Father's second assignment of error is overruled.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR